07 CV 4624

JUDGE KRAM

RECEIVED

MAY 3 1 2007

U.S.D.C. S.D. N.Y.
CASHIERS

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

Gaming Marketing Solutions, Inc.   :
                                  :
                   Plaintiff,    :    <u>VERIFIED COMPLAINT</u>
                                    :
          -against-          :
Kein Cross                        :
               Defendant.    :    May 30, 2007
                                    :

Plaintiff, Gaming Marketing Solutions, Inc. ("GMS"), by and through its attorneys, Maurer & Associates, PC, does hereby assert and allege for its' complaint against the Defendant, Kein Cross as follows:

### Nature of the Action

1. GMS, a marketing company, brings this action against Kein Cross, a merchandiser, for knowingly and maliciously interfering with GMS's business relationships with its partner in this venture, Maritz, Inc. and its client Foxwoods Resort Casino and disparaging GMS in its trade and business, thus, causing substantial and irreparable damage to GMS's reputation.

### Parties

2. GMS is a corporation duly formed under the laws of the State of Illinois having a principal place of business at 505 North Lake Shore Drive, St. 6601, Chicago, Ill. GMS provides merchandise, advertising

specialties, promotions and employee recognition programs to the
gaming industry.

3. Kein Cross is a merchandiser, having a principal address at 77 Barrow
   Street #1FW, New York, NY 10014.

### Jurisdiction and Venue

4. Jurisdiction is based on 28 U.S.C.A. § 1332(a) as there is complete
   diversity of citizenship between the parties and the amount in
   controversy exceeds $75,000.00 exclusive of interest and costs.

5. Venue is proper in the Southern District of New York pursuant to 28
   U.S.C.A. § 1391 because Defendant resides within its borders.

### Factual Background

6. GMS was founded by James Feldman, a leader in the incentive
   marketing industry for over thirty years, to provide a variety of
   marketing and incentive services exclusively to the heavily regulated
   gaming industry having a particular expertise in the fast growing and
   highly lucrative Tribal gaming operators.

7. Prior to GMS's relationship with Cross, GMS and James Feldman,
   enjoyed a sterling reputation in the incentive and Tribal gaming
   industries, having been repeatedly recognized by trade associations
   and the leading trade journals while enjoying a flawless reputation with
   its vendors and customers.

8. The Tribal gaming industry, although large in dollar volume, is very small in number of operators. Every person who works in the industry must be licensed and free of criminal and ethical violations.

9. Additionally, each operator enforces stringent ethical requirements on its employees and vendors. Foxwoods Resort Casino has, and enforces assiduously, the most stringent ethical, conflict of interest, and business practices requirements in the industry and demands the same level of behavior from all of its employees and vendors.

10. An incentive marketing company's reputation in the Tribal gaming industry for ethics and honesty is an asset to be fiercely protected. The industry is small and word travels fast about any company that loses a client under conditions that indicate that the company has not complied with the client's ethical standards.

11. The refusal of one casino to renew or employ a vendor on ethical grounds can lead to the entire industry refusing to do business with that company.

12. On or about April 1, 2007, GMS in conjunction with Maritz Inc., agreed in principle to provide to Foxwoods Resort Casino a completely redesigned and stocked loyalty program for the casino's guests (the, "Foxwoods/ GMS-Maritz Agreement"). The value of the contract to provide this service is well over $20 million in gross sales annually.

GMS-Maritz was chosen over multiple other competitors, including the prior vendor based, in part, on its reputation for integrity and creativity.

13. GMS agreed to have the program completely designed, implemented, and ready to be introduced to the Foxwoods Resort Casino's guests on Memorial Day weekend 2007. To accomplish that project in under two months required GMS to provide: a complete redesign of the space; substantial renovation; and to develop, purchase, ship, receive and merchandise a completely new array of products totally over 3800 items prior to the Grand Opening.

14. GMS contacted Kein Cross to provide creative merchandising services to the project on a very tight schedule. Cross provided a proposal which is attached as Exhibit "A" hereto. GMS provided a counter-proposal which incorporated the Scope of Work and final price from Cross's proposal and a number of other provisions including Confidentiality and Trade Secret segments required by the Foxwoods/GMS-Maritz Agreement. A copy of that counter-proposal is attached as Exhibit "B".

15. Attempting to expedite Cross' production of merchandising plans, GMS paid Cross $7500 in advance as 50% of the fee even though the timing of payment was a provision that had not been resolved.

16. After making trips to Foxwoods Resort Casino and to St. Louis to present plans for the project and to receive the $7500, Cross refused to execute the contract that is a condition precedent to doing any work as a sub-contractor to GMS on the Foxwoods project and demanded immediate payment of the balance of his fee.

17. When GMS refused to pay Cross prior to the completion of the work as stipulated in GMS' counter-proposal, Cross attempted to hold the completion of the project hostage by refusing to complete the work, to provide any of the completed design elements or to provide the required price lists, prop requirements and staging designs.

18. Even though Cross was repeatedly assured that he would be paid as the parties had agreed, he refused to complete the project, leaving GMS with less than three weeks to design, order, receive and merchandise the entire space.

19. GMS was forced to send GMS executives to live at the project and work around the clock to complete the project in a timely manner at substantial extra expense for overtime work, rush delivery, hotel and meal charges.

20. Due to the urgency of the project, Cross was provided valuable trade secrets by Maritz, Inc., Foxwoods Resort Casino, and GMS regarding future retail design, merchandise, pricing and profitability without

signing Foxwoods/ GMS-Maritz Agreement's mandatory non-disclosure and non-compete agreement. Further, Cross has been informed of certain strategic competitive information which would be valuable to any participant in the gaming industry.

21. Since Cross abandoned the project, he has threatened to disparage GMS to its client and venture partner.

22. Cross has said to GMS that his contract requires GMS to pay Cross $15000 before he goes to the site. This is false.

23. Cross has said to GMS that he will tell Foxwoods Resort Casino and Maritz, Inc. that GMS has refused to pay money that GMS owes him. This is false.

24. Cross has said that he will say to Foxwoods Resort Casino and Maritz, Inc. that GMS has not behaved ethically in its dealings with him. This is false.

25. Further, Cross has indicated a willingness to use the competitive information he has to the detriment of GMS. For example, Cross has learned that the client's nearest competitor uses certain design elements in its loyalty program and that the client has decided to use certain superior design elements in the future. If the competitor was informed of these superior design elements with time to respond to these changes, the impact of the Foxwoods/ GMS-Maritz program

would be diminished and incremental participation would be lost. This lose of incremental participation could cause the client to cancel the contract, both because of the ethical violation and because of the lack of performance.

26. On May 15, 2007 counsel wrote to Cross ordering him to cease and desist any disparagement of GMS and requesting that he sign the confidentiality agreement that he had declined to execute previously. Cross telephoned undersigned counsel's office and left a message saying that he intended to collect the remainder of his fee or he would have his attorney speak with "all of those involved."

27. Based on similar threats made previously in writing to GMS, GMS believes that Cross's intention is to disparage GMS's integrity and honesty to it's client, Foxwoods Resort Casino, and its venture partner, Maritz Inc., in an attempt to either extort additional payments from GMS or to cause Foxwoods Resort Casino not to execute the contract with GMS-Maritz Inc.

28. If Cross is successful in causing Foxwoods Resort Casino or Maritz, Inc. to refuse to execute the agreement with GMS or to revoke that agreement, GMS will lose the over $1 million it has invested in acquiring the client and the project to date as well as the profits from the contract.

29. Further, because the Tribal gaming industry is intensely competitive and small in number of operators, information spreads rapidly. Therefore, if Foxwoods Resort Casino or Maritz, Inc pulls out of the planned relationship with GMS because of a perceived "ethical issue", GMS's reputation and ability to acquire additional contracts in the industry will be seriously compromised.

30. The aforesaid actions of Cross are intended to harm GMS and the means used by Cross are malicious, dishonest, unfair, wanton, oppressive, tortious, and egregious in attempting to extort payment by threatening to defame plaintiff.

31. That GMS has expended over $1 million to acquire the opportunity to bid for the Foxwoods Resort Casino contract, to prepare its response to the RFP, to present its proposal, to plan and prepare for the Grand Opening, and to ship and merchandise a complete incentive marketplace sufficient to handle up to 50,000 daily guests at the physical location and additional guests at the web store.

32. Cross' false assertions, if believed by and acted on by Foxwoods Resort Casino and/or Maritz Inc., would cause GMS not only to lose the Foxwoods/ GMS-Maritz Inc. Agreement but damage relations with other current and potential clients in the Tribal Gaming Industry.

## For an Injunction to Enjoin Defamation

33. Cross knew at the time that he threatened to inform Foxwoods Resorts

Casino and Maritz Inc. that he had not been paid in violation of his

contract that the statement was false because:

    a.   Cross did not have an executed contract,

    b.  GMS had not agreed to pay Cross before completion,

    c.  GMS had not violated any agreement between them,

    d.  Cross had abandoned the work,

    e.  Cross had not completed the project, and

    f.  the segment of the work that Cross had done was also

       incomplete.

34. Further, Cross threatened words will defame GMS by implication and

innuendo with words that were meant to convey that GMS had

behaved wrongfully, dishonestly and unethically when it did not pay

him.

35. Unless Cross is enjoined immediately from contact with the Foxwoods

Resort Casino's and Maritz Inc.'s staff, Cross will convey this

defamatory information to them.

36. GMS will be irreparably damaged by Cross' threatened conduct in its reputation for honesty and ethical behavior. If believed by and acted on by Foxwoods Resort Casino and/or Maritz Inc., Cross' defamatory conduct would proximately cause GMS not only to lose the Foxwoods/ GMS-Maritz Inc. Agreement but damage its relations with other current and potential clients in the Tribal Gaming Industry.

37. Even though GMS' counsel has written to Cross and demanded that he cease and desist his defamatory conduct, he has informed counsel that he is determined to continue with his threatened conduct.

### Prayer For Relief

**WHEREFORE,** the plaintiff respectfully requests that this Court enter judgment in its favor and against the defendant and grant the following relief: a Permanent Injunction baring defendant from contact with Foxwoods Resort Casino or Maritz Inc. personnel for a period of one year.

### Demand for Jury

The Plaintiff demands a trial by jury.

Dated:     Ridgefield, CT
           May 30, 2007

                    PLAINTIFF,

                    Gaming Marketing Solutions, Inc.

By: _____

Elisabeth Seieroe Maurer (esm2215)
Maurer & Associates, PC
Attorney for Plaintiffs
871 Ethan Allen Hwy, Suite 202
Ridgefield, CT 06877
Phone: (203) 438-1388
Fax: (203) 431-0357
emaurer@maurerandassociates.com

## Verification

I, James Feldman, the CSO of GMS, Inc. do hereby verify that the allegations made herein are, to the best of my knowledge, information and belief, formed after inquiry, reasonable under the circumstances, true, have evidentiary support or are likely to have evidentiary support if reasonable opportunity for further investigation or discovery is allowed.

Dated: May 29, 2007

_____
James Feldman

Sworn to and signed by James Feldman, the declarant on this 29 day of May, 2007.

_____
Notary Public
My commission expires on

# EXHIBIT A

Kein Cross
77 Barrow Street, #1FW
New York, NY 10014
www.kein.com (646)256-0773


April 2, 2007

To: Mr. James Feldman and Ms. Jennifer Dobbin- GMS

Re: Foxwoods Resort Casino / Wampum Rewards Store

Thank you for the opportunity to submit a proposal for the restructuring and
remerchandising of the Wampum Rewards Shop at Foxwoods Resort Casino. After my
initial meetings with Ms. Dobbin and the Retail and Visual Merchandising Division of
Foxwoods Resort Casino, I feel I can assist you with your targeted goal of updating,
upscaling, and increasing overall sales by 50%.

Visual Merchandising Strategy
Through the development of an innovative and coordinated visual merchandising strategy
with the underlying objective to display and merchandise goods for optimum sales, I
believe I can contribute to the GMS/Maritz goal as follows:

-Boutique entire store into shop concepts and swing areas. This can be achieved by using
existing fixturing and onsite merchandising.
-Provide a detailed floor plan and drawings of how finished "shop concepts" will appear.
-Improve shop decor so the emphasis of the shop is on the merchandise by proper color
choices, lighting, fixture placement, and signage.
-Use merchandise as props to set the tone and soften overall look of the store.
-Work with Foxwoods/GMS buyers and/or merchants to create themes in advance for 45
day merchandise change to keep Wampum's Rewards Store looking fresh and forward.
-Work with existing team of buyers, retail and visual merchandising, and sales staff to
create the merchandise plan.

Fee Schedule

- Initial design concepts, which includes all of the points above:
  $15,000 plus expenses before any additional work is initiated (any onsite visits, travel). This design fee is due in full prior to acceptance of the project.

- Design and implementation of merchandise change, which would include one visit for new theme every 45 days:
  $5,000- to be paid within a 10 day period.

- Please note that this fee schedule does not include costs for any props, signage, or other supplies that are required.

To ensure that the new Wampum Rewards Visual Strategy has the best chance for success; I would undertake the project based on the launch through to the 07 holiday.

Timing

I understand that there is a requirement to commence on this project at the earliest opportunity particularly if the initial store concept is to be approved and in place prior to Launch on May 31. Once the terms of the contract are agreed and a Purchase Order has been issued, I would be available to meet with you at Foxwoods to present my work plans and timing schedule for the above strategy.

I look forward to the opportunity to work with you and please contact me if you should have any questions.

Best regards,


Kein Cross

# EXHIBIT B

## Independent Visual Merchandising Agreement

This agreement is made on April 1, 2007 between Gaming Marketing Solutions, Inc. an Illinois Corporation hereinafter referred to as "COMPANY" and Kein Company (Kein Cross) hereinafter referred to as "MERCHANDISER."

By signing this agreement, and acceptance, Kein Cross agrees to act as an independent Visual MERCHANDISER for Foxwoods Resort and Casino in CT.

MERCHANDISER is not an employee, stockholder, or legal representative of the COMPANY. MERCHANDISER understands that he is working as a self-employed, independent contractor. As an independent contractor, he is responsible for filing all necessary federal, state, and local taxes as may be applicable to my commissions, bonuses, and other prizes including merchandise or travel received from the COMPANY. In particular, I will not be treated as an employee with respect to any services for federal or state tax purposes. In addition, I understand that any State Unemployment or Worker's Compensation Act does not cover me.

I will present the COMPANY in a truthful, sincere, and honest manner, and MERCHANDISER will conduct myself in a manner that will reflect the highest standards of integrity and responsibility in keeping with the reputation of the COMPANY. MERCHANDISER will return and all materials belonging to the COMPANY or its Client Foxwoods Resort and Casino upon written notice. Failure to return property may result in COMPANY incurring legal fees to obtain return which will be deducted from any monies due MERCHANDISER. If COMPANY and MERCHANDISER terminate their relationship both parties agree to be binding terms from the American Arbitration Association, Chicago, IL. MERCHANDISER further agrees not to use the COMPANY'S or that of its client's name and/or trademarks. Website, or make any representations, without the prior written approval of an Authorized Officer of the COMPANY at its Home Office. MERCHANDISER will not solicit from our client any other work, offer any products or services except through COMPANY. I understand that any violation of this Agreement may result in cancellation of this Agreement.

The Parties hereto intend to exchange information for the purpose of a business relationship. In the course of such exchange of information, it is anticipated that each party may disclose or deliver to the other certain trade secrets or other confidential or proprietary information for the mutual business purpose of disclosure specified above ("Project"). The Parties hereto have entered into this Agreement in order to assure the continued confidentiality of such trade secrets and other confidential and/or proprietary information in accordance with the terms of this Agreement.

**NOW, THEREFORE,** for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged by the Parties) the Parties agree as follows:

1. Definition of Confidential Information and Exclusions.

    (a) "Confidential Information" means nonpublic information that a party to this Agreement ("Disclosing Party") designates, as being confidential to the party that receives such information ("Receiving Party") or which, under the circumstances surrounding disclosure ought to be treated as confidential by the Receiving Party. "Confidential Information" includes, without limitation, information in tangible or intangible form relating to and/or including released or unreleased Disclosing Party software or hardware products, Disclosing Party intellectual property including

1

but to limited to source code, the marketing or promotion of any Disclosing Party product, Disclosing Party's business policies or practices, customers lists, financial data, sales and marketing data including forward-pricing data, operations, personnel and employee information, know-how, product designs, capabilities, specifications, drawings, program code, product strategies, trade secrets, and information received from others that Disclosing Party is obligated to treat as confidential.  Except as otherwise indicated in this Agreement, the term "Disclosing Party" also includes all Affiliates of the Disclosing Party and, except as otherwise indicated, the term "Receiving Party" also includes all Affiliates of the Receiving Party.  An "Affiliate" means any person, partnership, joint venture, corporation or other form of enterprise, domestic or foreign, including but not limited to subsidiaries, that directly or indirectly, control, are controlled by, managed by, or are under common control with a party.  Prior to the time that any Confidential Information is shared with an Affiliate who has not signed this Agreement, the Receiving Party that executed this Agreement below (the "Undersigned Receiving Party") shall have entered into an appropriate written agreement with that Affiliate sufficient to enable the Disclosing Party and/or the Undersigned Receiving Party to enforce all of the provisions of this Agreement against such Affiliate.

(b)  Confidential Information shall not include any information, however designated, that: (i) is or subsequently becomes publicly available without Receiving Party's breach of any obligation owed Disclosing Party; (ii) became rightfully known to Receiving Party prior to Disclosing Party's disclosure of such information to Receiving Party pursuant to the terms of this Agreement or; (iii) became known to Receiving Party from a source other than Disclosing Party and other than by the breach of an obligation of confidentiality owed to Disclosing Party.

2.    Obligations Regarding Confidential Information



(a)  Receiving Party shall:

   (i)   Refrain from disclosing any Confidential Information of the Disclosing Party to third parties for five (5) years following the date that Disclosing Party first discloses such Confidential Information to Receiving Party, except as expressly provided in Sections 2(b) and 2(c) of this Agreement;

   (ii)  Take reasonable security precautions, at least as great as the precautions it takes to protect its own confidential information, but no less than reasonable care, to keep confidential the Confidential Information of the Disclosing Party;

   (iii) Refrain from disclosing, reproducing, summarizing and/or distributing Confidential Information of the Disclosing Party except in pursuance of Receiving Party's business relationship with Disclosing Party, and only as otherwise provided hereunder; and

   (iv)  Refrain from reverse engineering, decompiling or disassembling any software code and/or pre-release hardware devices disclosed by Disclosing Party to Receiving Party under the terms of this Agreement, except as expressly permitted by applicable law.

   (v)   Refrain from using the Confidential Information for any purpose other than as specifically described above or to solicit work. MERCHANDISER agrees not to

2

work with or solicit work from Mohegan Sun located in CT for a period of one year from the termination or completion of this agreement.

(b) Receiving Party may disclose Confidential Information of Disclosing Party in accordance with a judicial or other governmental order, provided that Receiving Party (i) gives the undersigned Disclosing Party reasonable notice prior to such disclosure to allow Disclosing Party a reasonable opportunity to seek a protective order or equivalent, and (ii) obtains written assurance from the applicable judicial or governmental entity that it will afford the Confidential Information the highest level of protection afforded under applicable law or regulation.

(c) The undersigned Receiving Party may disclose Confidential Information only to Receiving Party's employees and MERCHANDISER on a need-to-know basis. The undersigned Receiving Party will have executed or shall execute appropriate written agreements with its employees and MERCHANDISER sufficient to enable Receiving Party to enforce all the provisions of this Agreement against such employees.

(d) Receiving Party shall notify the undersigned Disclosing Party immediately upon discovery of any unauthorized use or disclosure of Confidential Information or any other breach of this Agreement by Receiving Party and its employees and MERCHANDISER, and will cooperate with Disclosing Party in every reasonable way to help Disclosing Party regain possession of the Confidential Information and prevent its further unauthorized use or disclosure.

(e) Receiving Party shall, at Disclosing Party's request, return all originals, copies, reproductions and summaries of Confidential Information and all other tangible materials and devices provided to the Receiving Party as Confidential Information, or at Disclosing Party's option, certify destruction of the same.

3.  Remedies

The Parties acknowledge that monetary damages may not be a sufficient remedy for unauthorized disclosure of Confidential Information and that Disclosing Party shall be entitled, without waiving any other rights or remedies, to such injunctive or equitable relief as may be deemed proper by a court of competent jurisdiction.

4.  Return of Confidential Information

Each Party shall keep a record of the Confidential Information furnished and the location of the Confidential Information. The Confidential Information shall be returned if the prospective transaction is not consummated within a reasonable period of time and in any event immediately upon the request of the other Party, and no copies, extracts or other reproduction shall be retained by either Party or its representatives. All documents, memoranda, notes and other writings whatsoever prepared by Company or its representatives based upon the Confidential Information shall be returned to the other Party or destroyed, such destruction shall be certified in writing to the other Party by an authorized officer certifying such destruction. The redelivery or destruction of such material shall not relieve either Party of its obligation of confidentiality or any other obligations hereunder.

3

5.    Miscellaneous

(a)  All Confidential Information is and shall remain the property of Disclosing Party.  By disclosing Confidential Information to Receiving Party, Disclosing Party does not grant any express or implied right to Receiving Party to or under any patents, copyrights, trademarks, or trade secret information except as otherwise provided herein.  Disclosing Party reserves without prejudice the ability to protect its rights under any such patents, copyrights, trademarks, or trade secrets except as otherwise provided herein.

(b)  This Agreement constitutes the entire agreement between the Parties with respect to the subject matter hereof.  It shall not be modified except by a written agreement dated subsequent to the date of this Agreement and signed by both Parties.  None of the provisions of this Agreement shall be deemed to have been waived by any act or acquiescence on the part of Disclosing Party, the Receiving Party, their agents, or employees, but only by an instrument in writing signed by an authorized employee of Disclosing Party and the Receiving Party.  No waiver of any provision of this Agreement shall constitute a waiver of any other provision(s) or of the same provision on another occasion.

(c)  If either Disclosing Party or the Receiving Party employs attorneys to enforce any rights arising out of or relating to this Agreement, the prevailing party shall be entitled to recover reasonable attorneys' fees and costs.  This Agreement shall be governed by, construed in and enforced in accordance exclusively with the laws of the State of Nevada.  If any provision of this Agreement is rendered inoperative or illegal by operation of law or otherwise, all other provisions contained herein shall remain in full force and effect, and in such cases the principle of severability shall govern.  The Parties agree that should any dispute arise hereon, then such dispute will be litigated, if necessary, solely and exclusively in the courts of Clark County, Nevada and in no other jurisdiction or forum.  Process may be served on either party in the manner authorized by applicable law or court rule.

(d)  This Agreement shall be binding upon and inure to the benefit of each party's respective successors and lawful assigns; provided, however, that neither party may assign this Agreement (whether by operation of law, sale of securities or assets, merger or otherwise), in whole or in part, without the prior written approval of the other party.  Any attempted assignment in violation of this Section shall be void.

(e)  If any provision of this Agreement shall be held by a court of competent jurisdiction to be illegal, invalid or unenforceable, the remaining provisions shall remain in full force and effect.

(f)  This Confidentiality provision shall remain in effect for a period of five (5) years from the date of disclosure provided, however, notwithstanding the foregoing, the protections provided to a Party as to its Confidential Information hereunder shall be in addition to, and not in limitation of, any other protection provided to the Party as to such Confidential Information under applicable law or in equity relating to trade secrets, unfair competition, intellectual property or otherwise.  All sections of this Agreement relating to the rights and obligations of the Parties concerning Confidential Information disclosed during the term of the Agreement shall survive any such termination.

(g)  Any demand, notice or other communication to be given in connection with this Agreement shall be given in writing and shall be given by personal delivery or by facsimile addressed to the receiving party at the address given above.  All notices shall be considered

4

delivered and effective when personally delivered or the day the transmission is sent if sent by facsimile.

(h) The Parties acknowledge that they substantially and materially have contributed to the preparation of this Agreement and agree that neither of them shall be deemed the drafter of this Agreement, and that in the event this Agreement is ever construed or interpreted by a court of competent jurisdiction, such court shall not construe or interpret this Agreement or any of its provisions against either of the Parties as the drafter.

MERCHANDISER will conduct or offer performance improvement products and services to potential clients. MERCHANDISER must furnish a detailed and complete outline of the Program to COMPANY for approval, which shall not be unreasonably withheld, before contract finalization between MERCHANDISER and its clients and consummation of any purchase. Due to the confidential relationship of COMPANY with suppliers, MERCHANDISER agrees to maintain strict confidentiality of any information provided to MERCHANDISER.

## TRADE MARKS AND INTELLECTUAL PROPERTY:

MERCHANDISER further agrees not to use the COMPANY'S, client or marketing partner's name and/or trademarks or any trademark owned by our suppliers, without the prior written approval of an Authorized Officer of the COMPANY at its Home Office who will obtain permission from suppliers. MERCHANDISER understands that any violation of this Agreement may result in cancellation of this Agreement.

MERCHANDISER acknowledges that marks, logos, images, graphic representation, trademarks, trade names, trade dress, service marks, domain names or other indicia of ownership by the execution, performance or non performance of this Agreement or any part, issued prior or contained herein shall be referred to as 'marks.' To date no 'marks' have been provided to MERCHANDISER. MERCHANDISER agrees and acknowledges that any such use of 'mark' is a violation of the agreement until provided by COMPANY. Some 'marks' are owned by third parties and the MERCHANDISER acknowledges that Company's relationship with suppliers could be damaged, terminated, or result in litigation if 'marks' are used without permission.

MERCHANDISER has no right, property, license, permission or interest of any kind in or to any 'mark.' Moreover, the various marketing partners may own other materials and "marks" therefore it is understood that COMPANY must receive approval from each marketing partner prior to providing overall approval for MERCHANDISER to reproduce any "marks" in any form. MERCHANDISER agrees not to use any 'marks' without written permission for each use, in any form including but not limited to placing any information on Internet.

COMPANY will grant access and permission to MERCHANDISER for client websites. However, MERCHANDISER may not offer any content to its client(s), for their use without first obtaining permission from COMPANY. COMPANY in providing subsequent approval to use 'marks' has not intended to give or transfer to MERCHANDISER any use other than provided in writing. MERCHANDISER indemnifies COMPANY for all use of 'marks' that do not adhere to the standards or specified use of 'marks' by MERCHANDISER or in the event,

MERCHANDISER agrees that they shall in no way contest or deny validity of, or the right or title of COMPANY and its marketing partners or clients in the use of the marks, images, graphics, and shall not encourage or assist others directly or indirectly to do so, during the lifetime of this

5

agreement and thereafter. MERCHANDISER shall not utilize any marks, images in any manner that would diminish their value or harm the reputation of COMPANY and its marketing partners.

MERCHANDISER acknowledges that COMPANY must approve any information or dissemination of any program, in advance, in writing. All advertising and promotional materials, including samples or files provided by COMPANY shall be subject to COMPANY's written approval.

MERCHANDISER shall not use, copy, or register any domain name or its content that is similar or identical to any information or 'marks' owned by COMPANY and its marketing partners without written permission. In the event web materials or other materials including, but not limited to, print in any media whether printed or electronic without written consent fro m COMPANY may damage its business relationship with COMPANY marketing partners. Distribution without prior written approval will damage its relationship with COMPANY'S marketing partners and that the degree of damage to those relationships is impossible to ascertain with any degree of certainty.

**CONFIDENTIALITY:** To be effective in delivery of COMPANY programs MERCHANDISER will have access to special relationships, contacts, prices, and other specially developed vendor partnerships or strategic alliances. MERCHANDISER has represented that they will protect the confidential material and information, which may be disclosed between MERCHANDISER and COMPANY. Therefore, the parties agree as follows:

The term "Confidential Information" means any information or material, which is proprietary to COMPANY, whether or not owned or developed by GMS or its affiliated businesses or suppliers, which is not generally known other than by COMPANY or its affiliated companies, and which MERCHANDISER may obtain through any direct or indirect contact with COMPANY.

Confidential Information includes without limitation:

- Business records and plans
- Supplier lists and records
- Trade secrets
- Technical information
- Products
- Inventions
- Product design information
- Pricing structure
- Discounts
- Costs
- Computer programs and listings
- Source code and/or object code
- Copyrights & other intellectual property
- Merchandise sources
- Other proprietary information.

This includes but not limited to any e-commerce sites, marketing of those sites and any information regarding the development, implementation, etc. of those sites.

## PROTECTION OF CONFIDENTIAL INFORMATION.

MERCHANDISER understands and acknowledges that the Confidential Information has been developed or obtained by COMPANY, it's marketing partners, and by it's clients by the investment of significant time, effort and expense, and that the Confidential Information is a valuable, special and unique asset of COMPANY. Marketing partners, and clients, which provides COMPANY with a significant competitive advantage, and needs to be protected from improper disclosure.    In consideration for the disclosure of the Confidential Information,

6

MERCHANDISER agrees to hold in confidence and to not disclose the Confidential Information to any person or entity without the prior written consent of COMPANY.

**No Copying.** MERCHANDISER will not copy or modify any Confidential Information without the prior written consent of COMPANY.

### Application to MERCHANDISER.

Further, MERCHANDISER shall not disclose any Confidential Information to any other employees, clients, or bureaus, except those employees who are required to have the Confidential Information in order to perform their job duties in connection with the limited purposes of this Agreement. Each permitted MERCHANDISER to whom Confidential Information is disclosed shall sign a non-disclosure agreement substantially the same as this Agreement at the request of COMPANY.

**Unauthorized Disclosure of Information.** If it appears that MERCHANDISER has disclosed (or has threatened to disclose) Confidential Information in violation of this Agreement, COMPANY shall be entitled to an injunction to restrain MERCHANDISER from disclosing, in whole or in part, the Confidential Information. COMPANY shall not be prohibited by this provision from pursuing other remedies, including a claim for losses and damages.

### RETURN OF CONFIDENTIAL INFORMATION.

Upon the written request of COMPANY, MERCHANDISER shall return to COMPANY all written materials containing the Confidential Information. MERCHANDISER shall also deliver to COMPANY written statements signed by MERCHANDISER certifying that all materials have been returned within five (5) days of receipt of the request.

Scope of Work for MERCHANDISER:

-Boutique entire store into shop concepts and swing areas. This can be achieved by using existing fixturing and onsite merchandising.
-Provide a detailed floor plan and drawings of how finished "shop concepts" will appear.
-Improve shop decor so the emphasis of the shop is on the merchandise by proper color choices, lighting, fixture placement, and signage.
-Use merchandise as props to set the tone and soften overall look of the store.
-Work with Foxwoods/GMS buyers and/or merchants to create themes in advance for 45 day merchandise change to keep Wampum's Rewards Store looking fresh and forward.
-Work with existing team of buyers, retail and visual merchandising, and sales staff to create the merchandise plan.

Fee Schedule for MERCHANDISER

Initial design concepts, which includes all of the points above:
$15,000 plus approved expenses before any additional work is initiated (any onsite visits, travel). This design fee is due as follows: 50% has been paid by COMPANY and is acknowledged as received by MERCHANDISER. No further payments are due until after

7

completion of scope of work and launch of Wampum Store current scheduled for Memorial Day weekend, 2007.

Design and implementation of merchandise change, which would include one visit for new theme every 45 days or as determined by COMPANY and MERCHANDISER:

$5,000- to be paid within a 10 day period upon completion of receipt and acceptance of new theme.

This fee schedule does not include costs for any props, signage, or other supplies that are required.

IN WITNESS WHEREOF, the Parties hereto have executed this Agreement.


**(COMPANY)**
Gaming Marketing Solutions, Inc. 505 N. Lakeshore Drive #6601
Chicago, IL 60611 312 527-1111 jfeldman@rewardchoices.com


*James Feldman, President*


**(MERCHANDISER)**                                        *Please Print*

Kein Cross 77 Barrow Street, #1FW New York, NY 10014 KeinCross@aol.com
(646) 256-0773 SS #_____

Signature_____

8