UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
---------------------------------------------------------------------------X
GAMING MARKETING SOLUTIONS, INC.,              :         Case No. 07 CV 4624
                                                :
                    Plaintiff,                  :         (KMK)
        -against-                               :
                                                :         **AFFIDAVIT IN OPPOSITION**
KEIN CROSS,                                     :
                                                :
                    Defendant.                  :
---------------------------------------------------------------------------X

STATE OF NEW YORK     )
                      )ss.:
COUNTY OF NEW YORK    )

KEIN CROSS, being duly sworn, deposes and says:

1.  I am the defendant in this action ("Defendant"). As such, I am fully familiar with the facts and circumstances set forth herein.

2.  This affidavit is respectfully submitted in opposition to plaintiff Gaming Marketing Solutions, Inc.'s ("Plaintiff") motion for a preliminary injunction, which should be denied in its entirety.

## BACKGROUND FACTS

3.  I am an interior, set and product designer and I am self-employed as such in New York City.

4.  After graduating from the University of Arkansas, I moved to New York City in the mid-1980s and worked as a window display designer for Barney's and Henri Bendel. In 1986, I was hired as the principal designer in Bergdorf Goodman and led the inaugural home furnishings floor design.

5.  Also in 1986, I partnered with Suzanne Spellen to create a women's couture line which received accolades from the prestigious Mouton Cadet Young

Designer Award from the Counsel of Fashion Designers of America. Suzanne Spellen and I subsequently opened Cross & Spellen Home, a modern furniture and home decorative store.

6. In 1992, I pioneered La Maison Moderne and La Maison Moderne Interiors, a two-story interior design business and home furnishings boutique in New York City which was a consistent success in its eleven (11) year run. My work through La Maison Moderne was featured in renowned periodicals such as the New York Times, Architectural Digest, New York Magazine and Town and Country.

7. In November 2003, I reinvented La Maison Moderne as KEIN, an updated version of La Maison Moderne which includes interior design as well as other elements of design, including personal care products.

8. On or about April 3, 2007, Jennifer Dobbins ("Dobbins"), an employee of Plaintiff, contacted me to discuss design and merchandising services. Dobbins, who I met while working on another project, explained that Foxwoods Resort and Casino ("Foxwoods") was seeking to upgrade, restructure and re-merchandise the Wampum Rewards Shop at the casino. Dobbins asked me to meet her at Foxwoods the next day.

9. On April 4, 2007, I met with Dobbins along with Foxwoods personnel at Foxwoods. I toured the store location, took pictures, drew a floor plan and discussed merchandising with them. While I was there, I explained to Dobbins that my initial design fee was $15,000.00 to be paid upfront.

10. Upon returning to New York and due to time constraints, I began my designs to restructure and re-merchandise the store. Specifically, my idea was to divide the store into a few different boutiques that featured various merchandise.

11. Subsequently, I received a call from James Feldman ("Feldman"), the president of Plaintiff, who advised me that Dobbins recommended me for this project. We discussed the project and my design and merchandising proposal for the store. Feldman then requested that I meet with him at Foxwoods and then attend meetings in Missouri with Maritz, Inc. ("Maritz"), its venture partner, to discuss my designs and merchandising.

12. During that conversation, I advised Feldman that my initial design fee was $15,000.00 to be paid up front. In response, Feldman requested to pay an initial $7,500.00 up front and then pay the balance ten (10) days after we returned from Missouri. Because I was interested in working on the project, I assented to this proposal.

13. On or about April 6, 2007, I returned to Foxwoods to meet with Feldman and Foxwoods personnel to discuss re-merchandising the store. At that time, I provided Feldman with a copy of my contract. (See, Exhibit "A."). After I spoke to Feldman, he left and then I met directly with maintenance and painting personnel as well as visual merchandisers who were all employed by Foxwoods.

14. I returned to Foxwoods on April 13, 2007, met with Foxwoods visual merchandisers and re-worked the merchandise and layout of the store, including changing light fixtures and furniture. I again met with the painting and maintenance personnel while I was there.

15. From April 13, 2007 through April 17, 2007, I continued designing the layout of the store and the merchandising in preparation for the meeting in Missouri. I emailed the designs and layouts directly to Foxwoods visual merchandisers as well as to Dobbins. Foxwoods personnel were very happy with and excited about my designs.

16.     On April 18, 2007, I flew to Maritz's offices in Missouri. Feldman met me at the airport. At that time, I had completed the layout and design of the store which I gave to Feldman. Feldman stated that he was very happy with my designs. Copies of some representations of my designs are annexed hereto as Exhibit "B."

17.     Later that day, I presented my designs at a meeting to Maritz personnel. Maritz personnel were so elated by my designs and floor plan that the individuals at the meeting insisted that I go to the office of each Maritz employee who was affiliated with the Foxwoods project but not at that meeting (ten additional employees) so that I could show them my designs and floor plans. Each Maritz employee was similarly thrilled with my work.

18.     On April 19, 2007, I presented my designs and layouts to Foxwoods personnel at the Maritz offices. They too were very happy and excited about my designs.

19.      Prior to the April 19, 2007 meeting, Feldman gave me a check for $7,500.00 and advised me that he would send me a confidentiality agreement. This was the first time that Plaintiff or anyone working for Plaintiff ever mentioned any such agreement to me.

20.     After I returned to New York, Dobbins called me on April 21, 2007 and advised that she wanted me to re-work the floor plan and the names of the boutiques. Although I communicated directly with them since the inception of the project and had developed a relationship with them, Dobbins requested that I cease communicating directly with Foxwoods personnel.

21.     During the period from April 21, 2007 through April 28, 2007, I re-worked the floor plans and then sent my revised plans to Dobbins and Feldman. Instead

of permitting me to present them myself, Dobbins alone presented my revised designs to Foxwoods.

22. By April 28, 2007, I had completed my initial designs, layouts and proposals for the store in which the space was divided into boutiques, the design and remerchandising in each boutique as well as five seasonal changes, re-design of the lighting and the signage and placement in each boutique.

23. On or about April 28, 2007, I received a copy of an Individual Visual Merchandising Agreement (the "Agreement") from Plaintiff. (See, Exhibit "C.") The Agreement was silent as to the payment of the $7,500.00 balance that Plaintiff owed me.

24. Upon receipt of the Agreement, I contacted Dobbins and advised that I wanted payment of the balance of $7,500.00 based upon the fact that I completed the design.

25. Dobbins advised that Plaintiff would pay the balance owed only after I signed the Agreement and my designs were installed. I responded that that was unacceptable and advised Dobbins that I wanted payment prior to installation. Despite our agreement and my request, I did not receive payment of the balance from Plaintiff.

26. On May 13, 2007, I sent an email to Dobbins and Feldman requesting payment of the $7,500.00 balance. Although I advised that my counsel would sent a collection letter if payment was not received, I was sure that this was an oversight and stated the same in my email. (See, Exhibit "D.")

27. On or about May 16, 2007, I received a letter from Plaintiff's counsel in which Plaintiff's counsel stated that I somehow threatened to disparage Plaintiff to Foxwoods, demanded that I forego seeking the balance of the monies owed to me by

Plaintiff, refund the $7,500.00 that I was already paid and execute a confidentiality agreement. (See, Exhibit "E")

28.     In response to the letter, I left Plaintiff's counsel a message either I or my attorneys would respond to her letter.

## PROCEDURAL HISTORY

29.     Plaintiff commenced this action on or about May 31, 2007. A copy of the Summons and Verified Complaint (the "Complaint") is annexed hereto as Exhibit "F."

30.     Upon receipt of a copy of the Complaint, the Order to Show Cause and memorandum of law in support of a motion for preliminary injunction by federal express on or about June 5, 2007, I sent an email to Plaintiff's counsel requesting that she contact my attorneys.

31.     I understand that my attorneys spoke to Plaintiff's counsel on June 6, 2007 and that counsel for both parties spoke to the Court about Plaintiff's motion. I also understand that the Court scheduled a conference on the motion to argue the temporary restraining order that Plaintiff sought on June 13, 2007. A copy of a Stipulation reflecting the same is annexed hereto as Exhibit "G."

32.     My attorneys advised me that Judge Hellerstein declined to issue a temporary restraining order on June 13, 2007 but set a briefing schedule for the motion pursuant to which, inter alia, Plaintiff could supplement its papers in support of the motion by June 20, 2007. (See, Exhibit "H.") However, we have not received any additional papers from Plaintiff to date.

33.     Plaintiff seeks a preliminary injunction to restrain and enjoin me from contacting Foxwoods or Maritz personnel for a one year period. For the reasons discussed

herein, Plaintiff's motion should be denied in its entirety.

## PLAINTIFF'S MOTION SHOULD BE DENIED IN ITS ENTIRETY

34. Plaintiff's motion for a preliminary injunction should be denied in its entirety because: (i) this Court lacks subject matter jurisdiction; or, alternatively, (ii) Plaintiff cannot establish the elements for a preliminary injunction.

### A. This Court Lacks Jurisdiction

35. I understand that Plaintiff commenced this action in federal court based upon diversity jurisdiction.

36. In this case, I am advised that there is no diversity jurisdiction because the matter in controversy is less than $75,000.00.

37. While Plaintiff may claim something different, the actual subject matter of this litigation is a dispute over the design and merchandising work that I performed at Foxwoods. At best, the valuation of the subject dispute is $7,500.00 (plus an extra $25,000.00 for additional designs), representing the balance of the $15,000.00 that Plaintiff owes to me.

38. Because Plaintiff cannot establish that the amount in controversy is at least $75,000.00, I am advised that this Court lacks subject matter jurisdiction.

### B. Plaintiff is Not Entitled to a Preliminary Injunction

39. In the event that the Court finds that it has subject matter jurisdiction, Plaintiff's motion should nevertheless be denied because I understand that Plaintiff cannot satisfy the necessary elements for the issuance of a preliminary injunction.

40. My attorneys have advised me that a party seeking a preliminary injunction must show: (a) irreparable harm and (b) either (1) likelihood of success on the

7

merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief. In this case, I understand that Plaintiff cannot meet this burden.

### (i) Plaintiff Cannot Show Irreparable Harm

41. I am advised that Plaintiff's argument of irreparable harm hinges upon Plaintiff's fear that I will tell Foxwoods and/or Maritz that: (i) the contract that I prepared provided that I was entitled to payment from Plaintiff in the amount of $15,000.00 before even visiting the work site; (ii) Plaintiff's refusal to pay me for the design and merchandising work that I performed would constitute unethical conduct; and (iii) I have indicated a willingness to use "competitive information" that I obtained performing the design and merchandising work.

42. Despite Plaintiff's assertions to the contrary, my attorneys have advised me that theses allegations do not amount to irreparable harm.

### (a) Plaintiff Already Disclosed Defendant's Contract and the Fact that it Failed to Pay Defendant

43. I am advised that Plaintiff contends that it would suffer irreparable harm if I disclosed to Foxwoods and/or Maritz that I am entitled to $15,000.00 for my design work even before visiting the work site and/or that Plaintiff did not pay me for my work.

44. Plaintiff contends that these disclosures would somehow constitute an ethical issue and/or unethical conduct which could compromise Plaintiff's contract with Foxwoods and reputation in the gaming industry.

45. Despite Plaintiff's claim, I understand that Plaintiff failed to provide a copy of its contract with Foxwoods or present a single rule or regulation of the Tribal Gaming Industry which governs Plaintiff's relationship with Foxwoods.

46.     Without these items, it is impossible to determine whether disclosure of these facts would compromise Plaintiff's purported contract with Foxwoods or its reputation in the gaming industry.

47.     Notwithstanding, by commencing this action and filing both the Complaint and Memorandum of Law with the Court, <u>Plaintiff has already disclosed and made public record both the contract that I prepared, which expressly states that $15,000.00 payment was due, and the fact that Plaintiff did not pay me</u>.

48.     Any purported harm that Plaintiff claims would arise from me revealing to Foxwoods or Maritz my claim that I am entitled to payment from Plaintiff of $15,000.00 or that Plaintiff did not pay me has already been undermined by Plaintiff's own actions in making these facts public record.

49.     As a result, Plaintiff cannot now claim that it would suffer any harm if I disclosed the same to Foxwoods or Maritz.

**(b)     Plaintiff Has Not Offered Any Evidence of
        Defendant's Purported Willingness to Use Trade Secrets**

50.     Plaintiff also contends that I have proffered a willingness to use trade secrets to Plaintiff's detriment. In paragraph "25" of the Complaint, Plaintiff alleges that:

> Further, Cross has indicated a willingness to use the competitive information he has to the detriment of GMS. For example, Cross has learned that the client's [Foxwoods] nearest competitor uses certain design elements in its loyalty program and that the client [Foxwoods] has decided to use certain superior design elements in the future. If the competitor was informed of these superior design elements with time to respond to these changes, the impact of the Foxwoods/GMS Maritz program would be diminished and incremental participation would be lost.

<u>See</u>, Exhibit "F."

51.     Absent from this allegation is any indicia whatsoever that I have or would undertake any actions to provide my designs to any competitor of Foxwoods.

52.     Although Plaintiff claims dissatisfaction with my work, it is evident that the superior design elements referenced in this allegation are clearly my designs.

53.     The allegations asserted in paragraphs "21" through "25" of the Complaint are nothing more than speculation and are devoid of any facts or merit. As a result, Plaintiff cannot establish irreparable harm. On this basis alone, Plaintiff's motion should be denied.

### (c)     Plaintiff Cannot Show a Likelihood of Success on the Merits

54.     I understand that Plaintiff claims that it will prevail on the cause of action for libel per se purportedly set forth in the Complaint.

55.     In order to establish libel per se, my attorneys have advised me that Plaintiff must show that I made a false statement about Plaintiff which I published to a third party.

56.     However, I never made any false statement about Plaintiff, let alone to a third party.

57.     Even the allegations in paragraphs "21" through "25" of the Complaint, which Plaintiff claims to be the purported false statements, each begin with what I will allegedly say to Foxwoods, not what has been said

58.     Without publication, my attorneys have advised that Plaintiff cannot establish libel per se, or, consequently, show a likelihood of success on the merits. On this basis alone, Plaintiff's motion should be denied.

59.     Additionally, absent from the Complaint is any allegation that I made a

false or defamatory statement about Plaintiff. This must be due to the fact that I have not made any false statements about Plaintiff or even discussed this matter with Foxwoods personnel.

60. Because I have not made a false statement or published any such false statement to a third party, I am advised that Plaintiff's cause of action is not ripe. On this basis alone, Plaintiff will not succeed on the merits.

61. Notwithstanding, the purported statements that Plaintiff relies upon are insufficient and substantively true. In paragraphs "21" through "25 of the Complaint, Plaintiff alleges:

> 21. Since Cross abandoned the project, he has threatened to disparage GMS to its client and venture partner.
>
> 22. Cross has said to GMS that his contract requires GMS to pay Cross $15,000.00 before he goes to the site. This is false.
>
> 23. Cross has said to GMS that he will tell Foxwoods Resort Casino and Maritz, Inc. that GMS has refused to pay money that GMS owes him. This is false.
>
> 24. Cross has said that he will say to Foxwoods Resort Casino and Maritz, Inc. that GMS has not behaved ethically in its dealings with him. This is false.
>
> 25. Further, Cross has indicated a willingness to use the competitive information he has to the detriment of GMS. For example, Cross has learned that the client's nearest competitor uses certain design elements in its loyalty program and that the client has decided to use certain superior design elements in the future. If the competitor was informed of these superior design elements with the time to respond to these changes, the impact of the Foxwoods/GMS-Maritz program would be diminished and incremental participation would be lost. This lose [sic] of incremental participation

11

> could cause the client to cancel the contract, both because of the ethical violation and because of lack of performance.

See, Exhibit "F."

62. With respect to the allegations in paragraphs "21," "24" and "25" of the Complaint, no false statement is specified or even alleged. Instead, Plaintiff speculates what I may say or do in each of these allegations.

63. Based upon Plaintiff's failure to set forth any particular words whatsoever in paragraphs "21," "24" and "25" of the Complaint which constitute a false statement, I understand that the allegations in paragraphs "21," "24" and "25" of the Complaint cannot serve as a basis for libel.

64. In paragraphs "22" and "23" of the Complaint, Plaintiff alleges that my statements to Plaintiff that my contract required the payment of $15,000.00 before I went to the site and that Plaintiff did not pay me constitute false statements.

65. However, the contract that I prepared expressly states that $15,000.00 is due before I made any site visits:

> Initial design concepts, which includes all of the points above: $15,000.00 plus expenses before any additional work is initiated (any onsite visits, travel). This design fee is due in full prior to acceptance of the project.

See, Exhibit "A."

66. In addition, Plaintiff concedes that it only paid me $7,500.00 and does not dispute the fact that it did not pay me the $7,500.00 balance owed. Thus, both of the allegations set forth in paragraphs "21" and "22" of the Complaint are true.

67. Without any false statement, I understand that Plaintiff cannot establish libel per se. On this additional basis, Plaintiff's motion should be denied.

### (d) The Equities Balance in Defendant's Favor

68. In this case, the equities tip in my favor. In its motion, Plaintiff is seeking to enjoin and restrain me from speaking to Foxwoods or Maritz personnel for a one year period.

69. However, Plaintiff has failed to proffer any evidence whatsoever that it would be harmed if I speak to Foxwoods or Maritz.

70. Although it baldly claims that its failure to pay me could be construed as unethical conduct, Plaintiff has failed to provide one shred of evidence or a single rule from the Tribal Gaming Counsel to evidence this contention. In any event, Plaintiff's failure to pay me what is due is not an ethical issue; it is a breach of contract issue.

71. To the contrary, I would be prejudiced if an injunction is issued prohibiting me from speaking to Foxwoods or Maritz personnel for a period of one year.

72. In the event that the requested injunction is issued, I could not adequately defend this case. Because I met with Foxwoods personnel directly about the design and merchandising work that I performed at the casino, Foxwoods personnel are important witnesses in this action who I need to speak with to prepare for any trial or hearing on this matter.

73. Even if I subpoenaed Foxwoods personnel, I am advised that the subpoenas could still be a violation of the preliminary injunction, if one is issued. As a result, Plaintiff would have an unfair advantage at trial. On this basis alone, the equities tip in my favor.

74. An injunction of this nature could also affect my livelihood.

75. Foxwoods and Maritz personnel were pleased with my work. If

Foxwoods wanted to employ me independently or on another project, an injunction would affect my business because I would not even be able to speak with Foxwoods personnel. I also could not use Foxwoods as a business reference.

      76.    Thus, the equities tip in my favor. On this additional basis, it is respectfully requested that Plaintiff's motion be denied in its entirety.

## **CONCLUSION**

Based upon the foregoing, it is respectfully requested that this Court issue an Order: (i) denying Plaintiff's motion in its entirety; and (ii) granting to Defendant such other and further relief as this Court deems just and proper.


/s/ Kein Cross
KEIN CROSS

Sworn to before me this
9th day of July, 2007

Zahidel Alvarado
Notary Public

EXHIBITS TO THIS MOTION WILL BE PROVIDED UPON REQUEST TO DEFENDANT'S COUNSEL.