UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

_____

N⁰ 07 Civ. 4624 (RJS)
_____

GAMING MARKETING SOLUTIONS, INC.,

Plaintiff,

VERSUS

KEIN CROSS,

Defendant.

_____

MEMORANDUM AND ORDER
April 1, 2008
_____

RICHARD J. SULLIVAN, District Judge:

Before the Court is the motion of plaintiff Gaming Marketing Solutions, Inc. ("GMS") for a preliminary injunction restraining defendant Kein Cross ("Cross") from contact with GMS's client, Foxwoods Resort Casino ("Foxwoods"). For the reasons that follow, the motion is denied.

I. BACKGROUND

A. Facts

The facts that follow are derived from the verified amended complaint, as well as affidavits submitted in conjunction with the preliminary injunction motion. The dispute between the parties in this case centers around a failed business relationship between GMS and Cross. GMS is a provider of marketing and incentive services to the gaming industry.

(Am. Compl. ¶ 6.) According to the amended complaint, on or about April 1, 2007, GMS, in conjunction with Maritz, Inc. ("Maritz"), its venture partner, entered into a contract with Foxwoods to provide Foxwoods with "a completely redesigned and stocked loyalty program for the casino's guests" (the "Contract"). (*Id.* ¶ 12.) The Contract is worth "well over $20 million in gross sales annually." (*Id.*) GMS was to fulfill its obligations to provide Foxwoods with the program in less than two months. (*Id.* ¶ 14.) Under the Contract, Foxwoods has the right to terminate the Contract "immediately upon material default and/or without cause on ninety days['] notice . . . ." (Am. Compl. ¶ 13.)

Shortly thereafter, an employee from GMS contacted Cross to discuss a possible collaboration, whereby Cross would assist in providing "creative merchandising services" in connection with the project. (*Id.* ¶ 15; Cross Aff. ¶ 8.) Cross indicated that he would be interested in the project, and met with GMS employees at Foxwoods on multiple occasions in early April 2007. (*Id.* ¶¶ 9, 13, 14.) During this time, Cross asserts that he worked diligently on the project, including visiting Foxwoods and flying to Missouri to meet with representatives of GMS and Maritz for the purpose of presenting his designs. (*Id.* ¶¶ 10, 15-18, 21-22; *see also* Am. Compl. ¶ 18.) Cross represents that he finished the initial designs by April 28, 2007. (Cross Aff. ¶ 22.)

According to Cross, he told GMS on at least two occasions that his fee was $15,000, payable upfront. (*Id.* ¶¶ 9, 12.) He states that GMS agreed to pay Cross his fee, but with the caveat that $7,500 would be paid upfront, with the balance to be paid ten days after he returned from the meetings in Missouri. (*Id.* ¶ 12.) Cross says that he accepted this arrangement because he wanted the job. (*Id.* ¶ 12.) GMS contends that the parties agreed that 50% of the $15,000 fee would be paid "upon purchase order" and the remaining 50% would be paid upon completion. (Am. Compl. ¶ 16, Ex. B.) According to GMS, Cross agreed that the first payment "was dependent upon receiving the 'proposed design concepts.'" (*Id.*) The parties agree that Cross was paid $7,500. (Am. Compl. ¶ 17; Cross Aff. ¶ 19.)

Cross contends that, on or about April 28, 2007, he received a copy of an agreement entitled "Individual Visual Merchandising Agreement" from GMS for signature. (Cross Aff. ¶ 23.) Cross asserts that he asked for payment of the balance of $7,500, and was advised that he would be paid after he signed the Agreement and after the designs were installed. (*Id.* ¶ 24, 25.) Cross then sent an email to GMS on May 13, 2007, requesting payment, and stating that his counsel would send a collection letter if payment was not received. (*Id.* ¶ 26; *see also* Am. Compl. ¶ 25, Ex. E.)

GMS asserts that Cross refused to sign the document, and refused to do any more work until he was paid. (Am. Compl. ¶¶ 18-24.) GMS also asserts that Cross has refused to sign a confidentiality agreement. (*Id.* ¶ 33.) GMS asserts that, since that time, Cross has "threatened to disparage GMS to its client and venture partner [Maritz]." (*Id.* ¶ 28.) It is unclear whether these threats consisted only of the letter referring to sending the collection letter (*see id.* ¶ 25, Ex. E), or additional oral or written threats. According to Cross, counsel for GMS responded to his letter and demanded that Cross forgo seeking the balance of $7,500 and refund the $7,500 that had already been paid to him. (Cross Aff. ¶ 27.)

B. Procedural History

The original complaint in this matter was filed on May 31, 2007. GMS subsequently moved for injunctive relief, and a conference was held before the Honorable Alvin K. Hellerstein, District Judge, on June 13, 2007 to address the motion. At that conference, Judge Hellerstein set a schedule for the briefing of the preliminary injunction motion, ordering GMS to "file any and all papers in support of its application" by June 20, 2007, Cross to file his opposition by July 10, 2007, and GMS to file its reply by July 13, 2007. GMS did not make any filings on June 20, 2007, relying instead on its original moving papers. On July 3, 2007, one week prior to the deadline for Cross's opposition papers, GMS filed an amended complaint via the court's Electronic Case Filing system ("ECF").[1] The amended complaint asserts three causes of action: (1) unjust enrichment; (2) violation of § 42-110b(a) of the Connecticut Unfair Trade Practices Act ("CUTPA"); and (3) an injunction barring Cross from contact with Foxwoods or Maritz for one year from the date of the amended complaint, which was filed on June 28, 2007.

Cross objected to the filing of the amended complaint and subsequently made an application for attorneys' fees based upon the allegedly improper timing of the amended complaint. Before resolution of the application, the case was reassigned from the Honorable Kenneth M. Karas, District Judge, to the undersigned. On December 14, 2007, this Court denied the application for fees. *See Gaming Marketing Solutions, Inc. v. Cross*, 528 F. Supp. 2d 403, 407 (S.D.N.Y. 2007). As a result of that order, and for the reasons discussed therein, the amended complaint is the operative complaint in this action. At the conference held on January 24, 2008, all parties agreed that GMS's motion for the preliminary injunction is fully submitted, and have asked the Court to decide the motion without any further submissions.

II. DISCUSSION

A. Jurisdiction

The first issue before the Court is Cross's assertion that the Court lacks subject matter jurisdiction because the amount in controversy does not satisfy the $75,000 threshold required for diversity jurisdiction. (Cross Opp. at 3.) For the following reasons, the Court finds that GMS has satisfied the amount in controversy requirement and the Court has jurisdiction to consider the application.

1. Standard of Review

District courts have original jurisdiction "where the matter in controversy exceeds the sum or value of $75,000 . . . and is between . . . citizens of different States." 28 U.S.C. § 1332(a)(1). Once diversity of citizenship has been established, in order to justify dismissal of the action, it "must appear to a legal certainty that the claim is really for less than the jurisdictional amount to justify dismissal." *Chase Manhattan Bank, N.A. v. Am. Nat'l Bank and Trust Co. of Chicago*, 93 F.3d 1064, 1070 (2d Cir. 1996) (quoting *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 288-89 (1938)); *see also Castlewood (US), Inc. v. Nat'l Indem. Co.*,

---

[1] Although the Amended Complaint is dated June 26, 2007, it appears that it was not docketed until July 3.

No. 06 Civ. 6842 (KMK), 2006 WL 3026039, at *3 (S.D.N.Y. Oct. 24, 2006). The Second Circuit "recognizes a rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy." *Castlewood*, 2006 WL 3026039, at *3 (quoting *Wolde-Meskel v. Vocational Instruction Project Cmty. Servs. Inc.*, 166 F.3d 59, 63 (2d Cir. 1999)).

"Where the plaintiff seeks injunctive relief, the value of his claim is generally . . . measured by the extent of the impairment to be prevented by the injunction. In calculating that impairment, the court may look not only at past losses but also at potential harm." *A.F.A. Tours, Inc. v. Whitchurch*, 937 F.2d 82, 87-88 (2d Cir. 1991); *see also Law Audit Servs., Inc. v. Studebaker Tech., Inc.*, No. 96 Civ. 926 (LMM), 1996 WL 137492, at *4 (S.D.N.Y. Mar. 27, 1996) ("[T]he Second Circuit has generally followed the majority of the courts in applying the 'plaintiff viewpoint' rule, holding that only the value of the suit's object to the plaintiff may be used to determine the jurisdictional amount."). "Before making a determination that the plaintiff's claim does not meet the jurisdictional minimum, the court must afford the plaintiff an 'appropriate and reasonable opportunity to show good faith in believing that a recovery in excess of [the jurisdictional amount] is reasonably possible.'" *A.F.A. Tours*, 937 F.2d at 88 (quoting *Arnold v. Troccoli*, 344 F.2d 842, 846 (2d Cir. 1965)).

2. Analysis

Cross does not dispute that the parties are diverse, but asserts that "[a]t best, the valuation of the subject dispute is $7,500.00, representing the balance of the $15,000.00 owed to [Cross]." (Cross Opp. at 3.) This is true if one were to look only at GMS's claims for monetary relief and ignore the preliminary injunction application. However, the Court must also examine "the extent of the impairment to be prevented by the injunction" and the "potential harm" to be suffered by GMS but for the entry of a preliminary injunction. *A.F.A. Tours*, 937 F.2d at 87-88.

GMS asserts in the amended complaint that if Cross is not enjoined from the threatened conduct, Cross's actions will "proximately cause GMS not only to lose the Foxwoods/GMS-Maritz, Inc. Agreement but damage its relations with other current and potential clients in the [industry]." (Am. Compl. ¶ 48.) The amended complaint also asserts that "[t]he value of the contract to provide this service is well over $20 million in gross sales annually." (Am. Compl. ¶ 12.) GMS further contends in its reply papers that GMS also stands to lose the $1 million that it has already invested in the project if Foxwoods were to cancel the project. (GMS Reply Mem. at 12.) Given these assertions, the Court must adopt the "rebuttable presumption that the face of the complaint is a good faith representation of the actual amount in controversy," as instructed by the Second Circuit. *Wolde-Meskel*, 166 F.3d at 63.

In the face of this presumption, the Court finds that Cross has failed to establish "to a legal certainty that the claim is really for less than the jurisdictional amount . . . ." *Chase Manhattan Bank*, 93 F.3d at 1070. Cross has put forth no evidence to show that the allegations in the amended complaint are false, or that the damages suffered by GMS would be less than $75,000 in the event the preliminary injunction was not granted. Cross

instead appears to conflate the claims for money damages with the claim for a preliminary injunction (*see* Cross Opp. at 3), rather than assess "the impairment to be prevented by the injunction." *A.F.A. Tours*, 937 F.2d at 88. Accordingly, the Court finds that the requirements of diversity jurisdiction are satisfied here.

### B. The Preliminary Injunction

GMS requests that the Court enter a preliminary injunction restraining Cross from all contact with Foxwoods for a period of one year. For the reasons that follow, that application is denied as wholly without support.

### 1. Standard of Review

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, by a clear showing, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (quotation and citation omitted); *see also Moore v. Consol. Edison Co. of New York, Inc.*, 409 F.3d 506, 510 (2d Cir. 2005). "To obtain a preliminary injunction a party must demonstrate: (1) that [he or she] will be irreparably harmed if an injunction is not granted, and (2) either (a) a likelihood of success on the merits or (b) sufficiently serious questions going to the merits to make them a fair ground for litigation, and a balance of the hardships tipping decidedly in its favor." *Lusk v. Village of Cold Spring*, 475 F.3d 480, 485 (2d Cir. 2007) (citing *Bronx Household of Faith v. Bd. of Educ.* 331 F.3d 342, 348-49 (2d Cir. 2003)).

"Irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 233-34 (2d Cir. 1999) (citations and internal quotation marks omitted). Because of this, "the moving party must first demonstrate that such injury is likely before the other requirements for the issuance of an injunction will be considered." *Id.* at 234 (citations and internal quotations omitted). In order to show irreparable harm, a plaintiff must show an injury that is both "actual and imminent" and "cannot be remedied by an award of monetary damages." *Shapiro v. Cadman Towers Inc.*, 51 F.3d 328, 332 (2d Cir. 1995) (internal quotation marks omitted) (citing *Tucker v. Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir. 1989)); *see Moore*, 409 F.3d at 510-11 (2d Cir. 2005) ("Where there is an adequate remedy at law, such as an award of money damages, injunctions are unavailable except in extraordinary circumstances."); *Reuters Ltd. v. United Press Int'l, Inc.*, 903 F.3d 904, 907 (2d Cir. 1990) (holding that irreparable harm "must be imminent, not remote or speculative, and the alleged injury must be one incapable of being fully remedied by monetary damages") (citations omitted). If the movant fails to make a showing of irreparable harm, the motion fails. *See Rodriguez*, 175 F.3d at 234.

Additionally, "for almost a century the Second Circuit has subscribed to the majority view that, absent extraordinary circumstances, injunctions should not ordinarily issue in defamation cases." *Metro. Opera Ass'n, Inc. v. Local 100, Hotel Employees and Rest. Employees Int'l Union*, 239 F.3d 172, 176 (2d Cir. 2001) (citations omitted); *see also Jordan v. Metro. Life Ins. Co.*, 280 F. Supp. 2d 104,

111 (S.D.N.Y. 2003); *New Era Publ'n Int'l v. Henry Holt & Co.*, 695 F. Supp. 1493, 1525 (S.D.N.Y. 1988) ("[W]e accept as black letter that an injunction is not available to suppress defamatory speech."). Injunctions of this kind are disfavored because "injunctions are limited to rights that are without an adequate remedy at law, and because ordinarily libels may be remedied by damages, equity will not enjoin a libel absent extraordinary circumstances." *Metro. Opera Ass'n*, 239 F.3d at 176; *see also Org. for a Better Austin v. Keefe*, 402 U.S. 415, 419 (1971) ("No prior decisions support the claim that the interest of an individual in being free from public criticism of his business practices in pamphlets or leaflets warrants use of the injunctive power of a court."); *Am. Malting Co. v. Keitel*, 209 F. 351, 356 (2d Cir. 1913) ("The fact that the false statements may injure the plaintiff in his business or as to his property does not alone constitute a sufficient ground for issuance of an injunction. The party wronged has an adequate remedy at law.").

Injunctions prohibiting speech are also disfavored because they impose a prior restraint on speech, and a prior restraint carries with it "a heavy presumption against its constitutional validity." *Metro. Opera Ass'n*, 239 F.3d at 176; *Lusk*, 475 F.3d at 485. "Prior restraints of future speech are particularly dangerous because of the difficulty courts face in designing an order that does not chill protected speech." *Jordan*, 280 F. Supp. 2d at 111-12 (citing *Latino Officers Ass'n, New York, Inc. v. City of New York*, 196 F.3d 458, 465 (2d Cir. 1999)). The Second Circuit has held that factors such as intimidation or coercion may constitute "extraordinary circumstances" sufficient to justify enjoining defamatory speech; however, "current First Amendment principles may prohibit granting an injunction even when such factors are present." *Metro. Opera Ass'n*, 239 F.3d at 177 (citing *Am. Malting*, 209 F. at 357).

2. Analysis

a. Irreparable Harm

GMS asserts in the amended complaint that Cross has "threatened to inform Foxwoods Resorts Casino and Maritz, Inc. that he had not been paid in violation of his contract . . ." and that those statements would be false. (Am. Compl. ¶ 45.) GMS further asserts that "Cross['s] threatened words will defame GMS by implication and innuendo with words that were meant to convey that GMS had behaved wrongfully, dishonestly and unethically when it did not pay him," and "[u]nless Cross is enjoined immediately from contact with the Foxwoods Resort Casino's and Maritz Inc.'s staff, he has threatened to convey this defamatory information to them." (Am. Compl. ¶¶ 46-47; *see also* GMS Mem. at 6.) According to GMS, the irreparable injury GMS stands to suffer includes "the over $1 million it has invested in acquiring the client and the project to date as well as the profits from the contract." (*Id.*) GMS also asserts that its "reputation and ability to maintain current contracts and acquire additional contracts in the industry" would be "seriously compromised" in the event that such statements were made. (*Id.*)

Because GMS has woefully failed to show the existence of an injury that is both "actual and imminent" and "cannot be remedied by an award of monetary damages,"

*Shapiro*, 51 F.3d at 332, the Court finds that GMS has fallen far short of demonstrating the existence of irreparable harm. First, GMS has failed to present any evidence whatsoever to demonstrate that the alleged harm to be incurred by GMS (including nullification of the contract by Foxwoods or Maritz or loss of good will in the industry) is "actual" or "imminent." At best, GMS offers mere speculation that, were Cross to make certain statements to Foxwoods or Maritz, cancellation of the contract would be *possible*, given that Foxwoods has authority to cancel the contract and "has, and enforces assiduously, the most stringent ethical, conflict of interest, and business practices requirements in the industry and demands the same level of behavior from all of its employees and vendors." (Am. Compl. ¶ 9.) Such remote and speculative allegations do not constitute a threat of irreparable harm. *See Reuters*, 903 F.2d at 907.

Second, GMS has failed to demonstrate that the majority of the injuries GMS stands to suffer could not "be remedied by an award of monetary damages." *Shapiro*, 51 F.3d at 332. As the Second Circuit has held, libels ordinarily are remedied by money damages, not injunctions. *See Metro. Opera Ass'n*, 239 F.3d at 176. If Cross were to make any defamatory statements, money damages certainly appear to be available here. Indeed, GMS has stated that the value of the contract with Foxwoods is approximately $20 million. (Am. Compl. ¶ 12.) In addition, GMS has offered no evidence that Cross could not satisfy a money judgment in the event of any loss to GMS. *See Netwolves Corp. v. Sullivan*, Nos. 00 Civ. 8943 (AGS), 2001 WL 492463, at *11 (S.D.N.Y. May 9, 2001) ("[W]here the defendant is insolvent, or may become insolvent during the pendency of the litigation, monetary injury is deemed irreparable because the plaintiff may never be able to recover damages."); *see also Bynog v. SL Green Realty Corp.*, No. 05 Civ. 305 (WHP), 2005 WL 3497821, at *4 (S.D.N.Y. December 22, 2005) (citations omitted).

b. Extraordinary Circumstances

Aside from the failure to demonstrate the existence of irreparable harm, GMS has made no attempt to show that this case presents the kind of "extraordinary circumstances" that would justify the imposition of an injunction and the resulting prior restraint on Cross's speech. *See Metro. Opera Ass'n*, 239 F.3d at 177. The Court finds that no such circumstances are present in this case. This lawsuit concerns a failed business relationship between two parties, one of whom is concerned about the effect of that failure on its other business relationships. The facts of the dispute are no secret; indeed, they are recounted in detail in the public filings in this case made by both GMS and Cross. Moreover, any statements by Cross that GMS failed to pay him money due and owing to him may turn out to be *true* — indeed, that is the factual dispute underlying the first two claims of the amended complaint.

Because GMS has failed to demonstrate the existence of irreparable harm, the Court need go no further in its analysis. *See Rodriguez*, 175 F.3d at 234. Moreover, GMS has shown no "extraordinary circumstances" that would merit the imposition of a preliminary injunction that would constitute a prior restraint on speech.

7

Accordingly, the preliminary injunction application is denied.

### III. CONCLUSION

For the reasons stated above, GMS's motion for a preliminary injunction is DENIED. Within 30 days of the date of this order, Cross shall either file an answer in this action, or submit a pre-motion letter to the Court, consistent with the Court's Individual Practices, indicating the grounds for any anticipated pre-answer motions.

SO ORDERED.

_____
RICHARD J. SULLIVAN
United States District Judge

Dated: April 1, 2008
    New York, New York

\* \* \*

Plaintiff Gaming Marketing Solutions, Inc. is represented by Elisabeth Seieroe Maurer, Esq., The Law Office of Elisabeth Seieroe Maurer P.C., 871 Ethan Allen Highway, Suite 202, Ridgefield, Connecticut, 06877. Defendant Kein Cross is represented by Susan Baumel Cornicello, Esq., Cornicello & Tendler, LLP, 116 John Street, Suite 2501, New York, New York 10038.